UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

<u>For Online Publication Only</u>

-----------------------------------------------------------------------X

BARBARA RUSSO,

Plaintiff,

-against-

TUTTNAUER USA COMPANY LIMITED,
BOB BASILE and KEVIN CONNORS,

Defendants.

-----------------------------------------------------------------------X

**<u>MEMORANDUM & ORDER</u>**
21-cv-1720 (JMA)(AYS)

**FILED**
**CLERK**

6/6/2025 3:44 pm

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**AZRACK, United States District Judge:**

Plaintiff Barbara Russo brought this employment discrimination action asserting five separate theories of liability: 1) Hostile Work Environment in violation of Title VII of the Civil Rights Act ("Title VII") and the New York State Human Rights Law ("NYSHRL"); 2) Gender Discrimination in the form of an unlawful termination in violation of Title VII and the NYSHRL; 3) Retaliation in the form of an unlawful termination in violation of Title VII and the NYSHRL; 4) Retaliation based upon the filing of a police report in violation of Title VII and the NYSHRL; and 5) Retaliation based upon Tuttnauer's commencement of civil litigation against Plaintiff, her husband, and her son, in violation of Title VII and the NYSHRL. (ECF No. 1.) A jury trial was held from January 6, 2025 to January 22, 2025. (ECF No. 87.) At the conclusion of trial, the jury returned a verdict finding in Plaintiff's favor with respect to her claim for a hostile work environment under Title VII and NYSHRL. (ECF No. 107.) The jury also found that Defendants Basile and Connors aided and abetted the creation of the hostile work environment. (<u>Id.</u>) The jury awarded Plaintiff $2,500,000 in compensatory damages and $5,000,000 in punitive damages. (<u>Id.</u>)

Presently before the Court is Defendants' motion pursuant to Federal Rule of Civil Procedure 50 to enter judgment as a matter of law in their favor with respect to the jury's finding of liability as to Bob Basile for aiding and abetting the creation of a hostile work environment at Tuttnauer. (ECF No. 110.) Additionally, Defendants moved for either a new trial on damages or

remittitur under Rule 59 for the jury's award of compensatory damages associated with Plaintiff's emotional distress.  (Id.)  Finally, Defendants moved to reduce or eliminate the jury's award of punitive damages because they exceed the statutory limit under Title VII.  (Id.)  For the following reasons, Defendants' motion is GRANTED IN PART and DENIED IN PART.

## I.    BACKGROUND

The Court assumes familiarity with the factual background and procedural history of this case and reviews it only as relevant to the present motion.  Plaintiff's hostile work environment claim arose from her employment at Tuttnauer USA, which began in November 1991.  (Tr. 766-67, 1144).  Plaintiff alleged that a hostile work environment persisted at Tuttnauer for years and that it involved numerous sexist and inappropriate emails being circulated amongst employees, inappropriate sexual comments being made to Plaintiff and other female employees regarding their weight and/or appearance, sexually explicit and offensive images and notes being placed in Plaintiff's office as well as the offices of other female employees, and sexually inappropriate comments and touching from Defendant Kevin Connors, the CFO of Tuttnauer during the relevant timeframe.  (ECF No. 1; Tr. 304, 489-490, 504, 523-24, 782-84, 1165-66, 1347.)  Plaintiff also alleged that Defendant Connors walked into her office on one occasion with his penis hanging out of his pants.  (ECF No. 1; Tr. 791.)  The alleged hostile work environment culminated in Defendant Connors' attempt to sexually assault Plaintiff in her office, during an incident in which Plaintiff testified that Connors grabbed her arms, pulled them behind her head, and pushed her down on her desk, pressing on her airways before she pulled away from him and fled the office.  (Tr. 826-28).

The above facts grounded Plaintiff's claim for damages pursuant to Title VII and NYSHRL for a hostile work environment.

2

A. **Facts Presented at Trial**

At trial, Plaintiff testified that throughout her employment at Tuttnauer up to her termination in 2018, she was subject to a toxic work environment characterized by numerous sexist emails and disturbing flyers, crude comments about women, and other occurrences that turned the workplace into a toxic environment.  (Tr. 780-83, 999-1000, 1165-66).  As corporate secretary, Plaintiff took and distributed meeting minutes, and as controller, she oversaw accounts receivables and payables.  (Tr. 766-68).  Defendant Robert Basile was a Senior Vice President at Tuttnauer, and Defendant Kevin Connors was the CFO.  (Tr. 53-54, 61-62.)  While Plaintiff was on the HR team with Defendant Basile and others, Plaintiff was never trained in HR, and employees and supervisors, including Basile, were never formally trained in reporting or investigating employment discrimination.  (Tr. 74-75, 82-85, 316-17, 774-76).

Several co-workers testified that Basile knew that supervisor Tim Krause's office wall was papered with pornography, his computer and laptop screensaver depicted naked women, and that Krause played explicit sex videos in front of other employees in his office.  (Tr. 268-69, 281, 524-27, 539-40, 548, 1515, 1517-20).  While the employee handbook identified Basile as responsible for addressing harassment complaints, numerous witnesses testified that Basile actively participated in inappropriate sexual discussions (primarily in the lunchroom) and did nothing to address situations when others contributed to the hostile work environment by inappropriately commenting on the physical appearance of female employees.  (Tr. 265-67, 276-77, 286-90, 291-93, 489, 492-93, 512, 533, 541-42, 578, 588).

Plaintiff testified that sexually inappropriate and offensive emails were circulated to Tuttnauer employees on a daily basis, and several such emails were entered into evidence at trial.  (Tr. 780; Pl.'s Ex. 43, 46, 47, 48, 63, 85.)  Furthermore, Plaintiff testified that sexually offensive images and notes were slid under her office door, including naked women engaging in

3

sexual activity, a naked man with an erect penis, notes about women being forbidden from entering certain areas, sexual jokes involving condoms and tampons, and messages naming Plaintiff and other female employees with crude and expletive language targeting these employees.  (Tr. 783-84, 1165-66; Pl.'s Ex. 20, 24, 33, 34, 44.)

Plaintiff further testified that about three to four times per week, Defendant Connors would inappropriately stare and makes gestures towards her.  (Tr. 999, 1346.)  Plaintiff testified that Defendant Connors would "come behind me and . . . squeeze my shoulders[.] . . .  He would try to put my hand in his private area[.] . . .  Come from behind me, rub against me, rub in front of me." (Tr. 1347.) Aware that Plaintiff was diabetic, Connors made sexual jokes by telling Plaintiff: "I know what you need, protein. I have protein right here for you." (Tr. 1347-48.)  On her birthday, Connors told Plaintiff, "I have a present for you, it's right here," and then proceeded to grab his crotch.  (Tr. 1348).  Both Plaintiff and co-worker Alice Mary Gruninger testified that on one occasion, Defendant Connors walked out of the bathroom with his penis hanging out of his pants and walked into Plaintiff's office, after which Plaintiff yelled at Connors to get out of her office.  (Tr. 559-60, 791.)  Plaintiff testified that she once told Basile about the hostile work environment, right after the incident in which Connors walked into her office with his penis out.  (Tr. 778-80, 997.)  Plaintiff mentioned the offensive pictures that someone had placed under her door and told Basile that "this man is going to get us into a lot of trouble someday." (Tr. 779-80, 1396.)  Plaintiff testified that Basile agreed but never followed up on this complaint.  (Tr. 778-80).

Plaintiff testified that she complained about the hostile work environment verbally and in a written letter to Ran Tuttnauer, who was then CEO of Tuttnauer, Ltd., the parent company of Tuttnauer USA.  (Tr. 777-78, 790-806, 1097-98; Pl.'s Ex. 37.)  Despite these complaints, Plaintiff testified that the sexual harassment continued, with sexually explicit images and notes

4

continuously placed in her office and Defendant Connors continuing to make sexually offensive remarks to her. (Tr. 809-26.)

Plaintiff testified that the hostile work environment culminated in Defendant Connors' attempt to sexually assault her in her office on January 26, 2018. (Tr. 827-28.) Plaintiff testified that as she was working with Connors in her office, he "grabbed [her] arms, pulled them behind [her] head, and pushed [her] down on [her] desk." (Tr. 828.) Plaintiff testified that Defendant Connors grabbed her neck and was pressing on her airways, causing her to yell. (Id.) Plaintiff pulled away from Connors, fled her office, and went home. (Id.) Plaintiff was terminated on February 1, 2018, five days after this alleged incident with Defendant Connors. (Tr. 829-30.) On the day she was fired, someone attached a copy of an invoice to Plaintiff's computer screen with a scribbled print stating: "Suck my cock." (Pl.'s Ex. 40; Tr. 831-34 ).

## B. Rule 50(a) Motion

Plaintiff completed the presentation of her case-in-chief on Tuesday, January 21, 2025. (Tr. 1687.) At that time, Defendants filed a Motion for Judgment as a Matter of Law pursuant to Fed. R. Civ. P. 50 with respect to all claims. (Tr. 1668-78.) Defendants' Motion was granted in part. (Tr. 1719.) Specifically, the Court entered an order dismissing Plaintiff's retaliation claims that were based upon Tuttnauer's commencement of a civil litigation. (Id.; Elec. Order dated Jan. 21, 2025.) The remaining causes of action were to be left for a jury's decision and verdict.

Subsequently, the jury reached a verdict in Plaintiff's favor on the hostile work environment claim, finding Defendant Tuttnauer USA liable for a hostile work environment and Defendants Connors and Basile liable for aiding and abetting the creation of the hostile work environment. (ECF No. 107.) The jury found in Defendants' favor with respect to Plaintiff's remaining claims: 1) her claim for discrimination based upon an unlawful termination; 2) her claim

for retaliation based upon an unlawful termination; and 3) her claim for retaliation based upon the filing of a police report.  (Id.)  The jury awarded Plaintiff $2.5 million in compensatory damages and $5 million in punitive damages.  (Id.)

### C. <u>The Instant Motion</u>

After the jury's verdict, Defendants filed a Rule 50 motion seeking judgment as a matter of law on the basis that there is insufficient evidence to hold Defendant Basile liable as an aider-and-abettor of the hostile work environment.  (<u>See</u> ECF No. 110-1 ("Def. Br.") at 5-7).  Defendants also request that the Court either order a new trial on damages or a remittitur under Rule 59 with respect to the jury's award of compensatory damages.  (<u>See id.</u> at 8-20.)  Finally, Defendants argue that the jury's award of punitive damages must be reduced or eliminated because the amount awarded exceeds the statutory limit under Title VII.  (<u>See id.</u> at 20-22.)

## II.    LEGAL STANDARDS

### A. <u>Judgment As a Matter of Law – Rule 50</u>

When resolving a Rule 50 motion for judgment as a matter of law, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."  <u>Reeves v. Sanderson Plumbing Prod., Inc.</u>, 530 U.S. 133, 150 (2000).  "Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe."  <u>Id.</u> "Incontrovertible evidence relied on by the moving party, such as a relevant videotape whose accuracy is unchallenged, should be credited by the court on such a motion if it so utterly discredits the opposing party's version that no reasonable juror could fail to believe the version advanced by the moving party."  <u>Zellner v. Summerlin</u>, 494 F.3d 344, 371 (2d Cir. 2007) (citing <u>Scott v. Harris</u>, 550 U.S. 372, 378-80 (2007)).  On genuine factual disputes, however, the court cannot "substitute its judgment for that of the jury."  <u>Smith v. Lightning Bolt Prods., Inc.</u>, 861 F.2d 363, 367 (2d Cir.

1988); <u>accord</u> <u>Herrera-Amador v. Lee</u>, No. 16-CV-5915, 2024 WL 2316134, at *3 (E.D.N.Y. May 22, 2024).

Additionally,

[A] party is not entitled to challenge on appeal the sufficiency of the evidence to support the jury's verdict on a given issue unless it has timely moved in the district court for judgment as a matter of law on that issue. Such a motion must be made "before submission of the case to the jury." Fed. R. Civ. P. 50(a)(2). Since the purpose of requiring that the motion be made before submission of the case to the jury is "to give the claimant a fair opportunity to cure the defects in proof," the motion "must at least identify the specific element that the defendant contends is insufficiently supported." For the same reason, although a motion for [judgment as a matter of law ("JMOL")] may be "renew[ed]" after the jury returns its verdict, see Fed. R. Civ. P. 50(a)(2), it may be renewed only on grounds that were specifically articulated before submission of the case to the jury[.]

As to any issue on which no proper Rule 50(b) motion was made, JMOL may not properly be granted by the district court, or upheld on appeal, or ordered by the appellate court unless that action is required in order to prevent manifest injustice.

<u>Kirsch v. Fleet St., Ltd.</u>, 148 F.3d 149, 164 (2d Cir. 1998) (cleaned up).

**B. <u>Motion for a New Trial – Rule 59</u>**

Rule 59(a)(1)(A) of the Federal Rules of Civil Procedure provides that a "[t]he court may, on motion, grant a new trial on all or some of the issues – and to any party . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A).  Rule 59(a)(1)(A) permits a court to grant a new trial "[if] the verdict is against the weight of the evidence."  <u>See</u> <u>Raedle v. Credit Agricole Indosuez</u>, 670 F.3d 411, 417 (2d Cir. 2012).  "[A] decision is against the weight of the evidence . . . if and only if the verdict is [(1)] seriously erroneous or [(2)] a miscarriage of justice."  <u>Id.</u> at 417-18 (citing <u>Farrior v. Waterford Bd. of Educ.</u>, 277 F.3d 633, 635 (2d Cir. 2002)).  "A motion for a new trial ordinarily should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice."  <u>Medforms, Inc. v. Healthcare Mgmt. Sols., Inc.</u>, 290 F.3d 98, 106 (2d Cir. 2002) (internal quotation marks omitted).

7

In considering a Rule 59 motion on the issue of damages, courts may "order[ ] a new trial without qualification, or conditioned on the verdict winner's refusal to agree to a reduction (remittitur)."  Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 433, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996); see also Stampf v. Long Island R. Co., 761 F.3d 192, 204 (2d Cir. 2014) ("Remittitur is the process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial.") (internal quotation marks and citation omitted).  Under Federal law, remittitur is appropriate where a jury award "is so high as to shock the judicial conscience." Kirsch v. Fleet St., Ltd., 148 F.3d 149, 165 (2d Cir. 1998).  Under New York law, "an award is deemed excessive 'if it deviates materially from what would be reasonable compensation.'"  Lore v. City of Syracuse, 670 F.3d 127, 177 (2d Cir. 2012) (quoting N.Y. C.P.L.R. § 5501(c)).

### III.    DISCUSSION

Defendants argue that the jury's verdict finding Defendant Basile liable for aiding and abetting the creation of a hostile work environment must be set aside, and judgment entered in their favor.  For the following reasons, Defendants motion for judgment as a matter of law under Rule 50 is DENIED.  However, the Court GRANTS Defendants' request for remittitur of the jury's compensatory damages award as well as Defendant's request to reduce the amount of punitive damages awarded in order to align with Title VII's statutory cap.

### A. **Sufficiency of Evidence**

Defendants first argue that the Court should enter judgment as a matter of law pursuant to Rule 50 because the evidence was insufficient to find Defendant Basile liable for a hostile work environment, either through his own direct conduct or as an aider and abettor.  Defendants argue that while Plaintiff entered into evidence several allegedly inappropriate e-mails sent by Basile, all of these e-mails were sent before the relevant statutory time period for the alleged hostile work environment.  (Def. Br. at 6.)  Furthermore, Defendants argue that Basile cannot be liable as an

aider and abettor because Plaintiff did not complain to Basile about the hostile work environment during the actionable statutory period and because she did not specifically complain about the discriminatory conduct she was experiencing at Tuttnauer from Defendant Connors and others.  (Id. at 7.)

Plaintiff responds to Defendants arguments by noting that the continuing violation doctrine allowed the jury to consider conduct that occurred prior to August 15, 2017 as part of the alleged hostile work environment claim if it "was sufficiently similar in nature, frequency, and severity, such that it was part of a continuing hostile work environment." (Pl. Br. at 11.)  However, the jury was also instructed that "if conduct spans across different people or large time intervals, without harassing conduct occurring, then, you could find that conduct that predated August 15, 2017, is not sufficiently related to constitute a continuing hostile work environment." (Id. (citing Tr. 1806-07).)  Furthermore, Plaintiff correctly argues that liability for aiding and abetting a hostile work environment "may extend to supervisors who failed to investigate or take appropriate remedial measures despite being informed about the existence of alleged discriminatory conduct."  (Pl. Br. at 11 (citing Aiola v. Malverne Union Free Sch. Dist., 115 F. Supp. 3d 321, 337 (E.D.N.Y. 2015).)  Here, the record supports the jury's finding that Basile aided and abetted the hostile work environment at Tuttnauer.

To establish individual liability under the NYSHRL, "a plaintiff must plead and prove that a defendant was personally involved in the violation."  Adams-Flores v. City of New York, No. 18-CV-12150, 2020 WL 996421, at *6 (S.D.N.Y. Mar. 2, 2020); see Feingold v. New York, 366 F.3d 138, 158 (2d Cir. 2004).  A plaintiff may establish individual liability by showing that a defendant failed to take remedial action in response to reports of discriminatory behavior or observation of discriminatory behavior.  See Lee v. Riverbay Corp., 751 F. Supp. 3d 259, 290 (S.D.N.Y. 2024).  The evidence at trial was sufficient to allow the jury to reasonably conclude that

Defendant Basile actively participated in and condoned the hostile work environment at Tuttnauer both before and after August 15, 2017, which is the relevant statute of limitations date.

Testimony at trial revealed that in early 2018, after Plaintiff complained to Defendant Basile about the lack of toilet paper in the women's bathroom, she received a note under her office door reading: "What is four inches long two inches wide and drives barbara Out of her fucking mind that damn empty toilet paper roll Not cock hahahahahaha." (Pl.'s Ex. 32; Tr. 825-27). Plaintiff testified that this note was slid under her office door in early 2018 after she had made complaints to Defendant Basile that there was never any toilet paper in the women's bathroom. (Tr. 825-827.) Plaintiff further testified that she did not complain to anyone else other than Defendant Basile about the toilet paper in the women's bathroom. (Tr. 827.) Since Plaintiff testified that she only complained to Defendant Basile about the toilet paper shortage, the jury could have reasonably concluded that Defendant Basile left that message for the Plaintiff. Furthermore, since the message was similar in tone and style to the other sexist notes and images that Plaintiff received at work both before and after August 15, 2017, the jury could reasonably conclude that this message was part of a continuing violation and furthered the hostile work environment experienced by Plaintiff at Tuttnauer.

Defendants argue in response that this message left for the Plaintiff cannot be attributed to Defendant Basile because Plaintiff testified that she "created" the document during cross examination. (Def. Repl. at 2.) Defendants refer to the following questions and answers during Plaintiff's cross examination:

"Q. I'm going to show you a document in evidence as Exhibit 32. Do you see that document?
A. Yes.
Q. Who created that document?
A. I did."

(Tr. 1181.)  However, this answer was given in the context of Plaintiff explaining a process in which she collected several messages and graphic images that were placed under her door and placed them into a folder in order to document the hostile work environment she was experiencing at Tuttnauer.  (Tr. 785-87, 802, 1015-17, 1181-82.)  Moreover, immediately after the portion of testimony that Defendants refer to, the following questions and answers were given:

> Q: Okay. And is this one of the documents that you believe was placed or shoved under your door?
> A. Yes.
> Q. What did you do with that document when you saw it?
> A: Put it in the folder.

(Tr. 1181-82.)  Therefore, the jury could reasonably conclude that this was one of the inappropriate messages that Plaintiff received in her office and that she later placed it in a folder with other messages and images to document the hostile work environment she was experiencing at Tuttnauer.

In addition to this alleged activity by Defendant Basile, the jury could have found that he aided and abetted the hostile work environment as part of a continuing violation by sending sexually offensive emails on January 30, 2017, February 8, 2017, and March 6, 2017.  (Pl.'s Exs. 43, 63, 85; Tr. 782-84.)  Furthermore, in 2013, Basile allegedly did nothing when a service technician sent him, Plaintiff, and 12 other employees an email with a graphic sex joke. (Pl.'s Ex. 47; Tr. 100-01, 780).  While Basile claimed he never saw this email or other offensive e-mails that he was listed as a sender or recipient on, (Tr. 188-89, 191-95, 217, 219-222, 255), the jury could have reasonably disbelieved him since the documents listed him as a sender or recipient.  Furthermore, Defendant Basile testified that he never tried to confirm, through the company's computer technicians or otherwise, whether someone else had cut-and-pasted his name onto these e-mails.  (Tr. 106-14, 196-98, 234-36.)  In 2011 and 2015, an engineer sent Plaintiff and Basile sexually inappropriate emails.  (Pl.'s Ex. 46, 48; Tr. 95-100, 185-86, 781-82, 779-780).  While

Basile also denied seeing these emails (Tr. 99, 191-94, 255), the jury could reasonably have found otherwise.  Plaintiff testified that emails like this were "common" and circulated "'[o]n a daily basis." (Tr. 780.)  By sending sexually offensive e-mails and not taking action to address similar e-mails that were received by himself and Plaintiff, Basile could reasonably be found to have aided and abetted the hostile work environment.

Plaintiff testified that she complained to Defendant Basile about the hostile work environment right after Defendant Connors "had come out of the bathroom with his penis hanging out." (Tr. 779; see Tr. 997.)  Plaintiff testified in addition to complaining to the CEO of Tuttnauer Ltd. about the offensive images and notes being circulated at the office, she also complained to Defendant Basile about these topics.  (Tr. 779.)  Regarding Defendant Connors and his alleged inappropriate behavior, Plaintiff testified that she told Defendant Basile that "this man is going to get us into a lot of trouble someday," to which Defendant Basile replied: "yes."  (Id.)  Plaintiff further testified that there was no follow-up from Defendant Basile on this issue.  (Tr. 780.)  Furthermore, the trial record contained evidence that Basile knew about and participated in inappropriate sexual and gender-based discussions at the office.  (Tr. 265-68, 276-77, 286-90, 291-93, 489, 492-93, 512, 533, 541-42, 578, 588).  Defendant Basile's secretary, Laura Gorman, testified that Basile was present when these offensive discussions occurred, did nothing to stop it, and sometimes participated in the inappropriate discussions.  (Tr. 285-93.)  Given the evidence at trial, jury reasonably concluded that Defendant Basile had aided-and-abetted the hostile work environment at Tuttnauer.

Defendants argue that all of Defendant Basile's discriminatory conduct occurred before the statutory limitation date, but the jury could have reasonably concluded that Defendant Basile "failed to investigate or take appropriate remedial measures" both before and after the relevant statutory date of August 15, 2017.  See Aiola, 115 F. Supp. at 337 ("[l]iability 'may extend to

supervisors who failed to investigate or take appropriate remedial measures despite being informed about the existence of alleged discriminatory conduct."); Delisi v. Nat'l Ass'n of Pro. Women, Inc., 48 F. Supp. 3d 492, 496 (E.D.N.Y. 2014) ("courts have found that a failure to investigate can constitute 'active participation' to support an 'aiding and abetting' claim") (citing Feingold v. New York, 366 F.3d 138, 157-158 (2d Cir. 2004) (summary judgment denied on § 296 claims where defendants took no action to remedy such behavior of which they were aware)).

As outlined above, there was extensive testimony and evidence presented at trial regarding the overall hostile work environment at Tuttnauer and Defendant Basile's actions and inactions in the years prior to the statutory limitation date, including Defendant Basile's failure to investigate Plaintiff's complaints regarding sexually offensive images and Defendant Connor's behavior.  (Tr. 779-80.)  Furthermore, Defendant Basile was the Senior Vice President and a member of the HR team for the 40-person workforce in the Tuttnauer USA office, and his office was located right in between Plaintiff's office and Defendant Connor's office, near the location where much of the alleged harassment took place.  (Tr. 153.)  This evidence, along with the circumstantial evidence that Defendant Basile had involvement in placing sexually offensive notes in Plaintiff's office, allowed the jury to draw the reasonable conclusion that Defendant Basile knew of the hostile work environment, participated in it, and failed to investigate it, both before and after the statutory limitation period and as part of a continuing violation theory.  Therefore, Defendant's Rule 50 motion is denied.

**B.  <u>Remittitur</u>**

Defendants also request that the Court order a new trial on damages or remittitur based on the jury's "excessive" damages award.  (<u>See</u> Def's Br. at 3-4.)  As stated above, under New York law, "an award is deemed excessive 'if it deviates materially from what would be reasonable

compensation.'"[1] Lore, 670 F.3d at 177 (quoting N.Y. C.P.L.R. § 5501(c)).  Defendants argue that the jury's award of compensatory damages "far exceed the damages that have been awarded in comparable cases" that involve worse conduct and more severe harm.  (Def Br. at 9.)  Defendants contend that the compensatory damages award should be remitted to $75,000.  (Id. at 18.) Additionally, Defendants contend that the punitive damages award should be reduced or eliminated because the $5 million punitive damages award exceeds the statutory limit under Title VII.  (Id. at 20-22.)

For the reasons that follow, the Court grants Defendants' motion for remittitur.  The Court remits Plaintiff's $2,500,000 compensatory damages award to $1,000,000 and reduces the punitive damages award to $299,999 in order to comply with the statutory limit set forth under Title VII.

1. Compensatory Damages

Under applicable New York state law, a monetary judgment is excessive "if it deviates materially from what would be reasonable compensation." Allam v. Meyers, 906 F.Supp.2d 274, 286 (S.D.N.Y. 2012).  "In determining whether an award 'deviates materially from what would be reasonable compensation,' N.Y.C.P.L.R. § 5501(c), [district courts] compare the jury's award to awards allowed in analogous cases involving similar types of injuries." Allam, 906 F.Supp.2d at 286–87 (citing Gasperini v. Ctr. for Humans., Inc., 518 U.S. 415, 425 (1996)).  "While instructive, such earlier awards are not binding for [district courts'] review." Id. at 287 (citing Lewis v. City of New York, 689 F.Supp.2d 417, 430 (S.D.N.Y. 2010)).

---

[1]     As will be discussed infra Section B. 2., the Court will allocate all of the compensatory damages for pain and suffering (less one dollar) to the uncapped NYSHRL claim for a hostile work environment and allocate all of the punitive damages to the capped Title VII claim.  Therefore, the Court will analyze the jury's award of compensatory damages under New York law to determine whether it "deviates materially from what would be reasonable compensation." Lore, 670 F.3d at 177 (quoting N.Y. C.P.L.R. § 5501(c)).

A court should determine whether the award is "within a reasonable range," not just "balance the number of high and low awards and reject the verdict in the instant case if the number of lower awards is greater." Tretola v. Cnty. of Nassau, 14 F. Supp. 3d 58, 80 (E.D.N.Y. 2014) (quoting Ismail v. Cohen, 899 F.2d 183, 186 (2d Cir. 1990.) Additionally, "[i]n the compensatory damages context, the Second Circuit has adopted the 'least intrusive standard' for remittitur, which holds that 'a district court should remit the jury's award only to the maximum amount that would be upheld by the district court as not excessive.'" Herrera-Amador v. Lee, No. 16-CV-5915, 2024 WL 2316134, at *8 (E.D.N.Y. May 22, 2024) (quoting Earl v. Bouchard Transp. Co., 917 F.2d 1320, 1328 (2d Cir. 1990)).

Here, the jury awarded Plaintiff $2,500,000 in compensatory damages for her hostile work environment claim. (See ECF No. 107.) Given the details of this case, the Court finds that this award is excessive.

At trial, Plaintiff presented evidence of the pain and suffering she experienced as a result of the hostile work environment she experienced at Tuttnauer. Plaintiff testified that her mood began to change in 2016 and 2017, when she started to have eating problems, became socially withdrawn, stopped engaging in hobbies that previously interested her, and "fell into a deep depression." (Tr. 860.) Plaintiff testified that her desire to avoid people led her to stop going out to eat with her husband like she used to. (Tr. 1277). Plaintiff began taking medication for depression in 2018 or 2019 and is still taking such medication. (Tr. 859-60, 1299.)

Plaintiff testified that for the first time in her life, she began suffering panic attacks in 2016 or 2017. (Tr. 858). She testified that during these panic attacks, she feels "all the air being sucked out" of her to the point where she feels like she is going to pass out, and then she starts to hyperventilate. (Id.) Plaintiff has reportedly suffered panic attacks "constantly" since 2016-17. (Id.) Plaintiff further stated that for about a year and a half, Defendant Connors "was constantly

coming after me, and on my way to work in the morning I would have panic attacks not knowing if that day he was going to touch me or he was going to say something or he was going to threaten me with my job by saying things like 'if you want to keep your job, you know what you have to do for me.'"  (Tr. 846).  Plaintiff also testified about experiencing insomnia, night sweats, nightmares, intestinal issues, and weight loss as a result of the emotional distress she experienced from the hostile work environment.  (Tr. 858-60, 906-08, 1354.)

From June 2019 through June 2022, Plaintiff treated with Dr. Enoch Chan, a physician specializing in internal medicine who diagnosed Plaintiff with post traumatic stress disorder ("PTSD"), generalized anxiety disorder, and major depressive disorder.  (Tr. 1020.)  Dr. Chan prescribed Plaintiff various medications to treat for PTSD, panic attacks, nightmares, and nervousness.  (Tr. 866-67.)  Plaintiff stopped seeing Dr. Chan in June 2022 because he no longer accepted her insurance, but she continued receiving these prescription medications through her primary care physician.  (Tr. 865-67.)

Plaintiff's husband and son both testified about changes in Plaintiff's behavior in which she suffered panic attacks, became socially withdrawn, experienced eating problems and hair loss, and stopped engaging in hobbies that had previously interested her.  (Tr. 1523-25, 1573-79.) Plaintiff's husband testified that Plaintiff is still suffering this emotional distress to a large degree. (Tr. 1578-79.)  Finally, Dr. Darlene Powell Garlington, an expert in clinical psychology, PTSD, and related disorders, testified that after having met with Plaintiff for three to four hours and administering various tests, she concluded that Plaintiff's PTSD and psychological trauma were caused by the sexual harassment she suffered at work, including the attempted sexual assault by Defendant Connors.  (Tr. 1421, 1443-44, 1465.)

Plaintiff argues the emotional damages she suffered are "egregious," and should be compensated as such.  (See Pl. Br. at 15) (citing Sooroojballie v. Port Auth., 816 Fed. App'x 536,

16

546 (2d Cir. 2020) (describing "egregious" emotional distress claims as those that "yield the highest awards and are warranted only where the employer's conduct was outrageous and shocking or affected the physical health of the plaintiff.")) While the Court agrees that Plaintiff's emotional distress was in fact egregious, the Court cannot find comparable precedent to ground the jury's award of $2,500,000. Neither, does it seem, can Plaintiff. Even the comparable cases Plaintiff cites only establish a compensatory damages award of $1,481,809.59 (in 2025 dollars[2]) at the high end in the context of a hostile work environment claim and attendant emotional damages. (See Pl. Br. at 22-23) (citing Turley v. ISG Lackawanna, Inc., 774 F.3d 140, 163–64 (2d Cir. 2014)).

In Turley, the Second Circuit affirmed a jury's award of $1,060,000 (which amounts to $1,481,809.59 in 2025 dollars) in compensatory damages for emotional distress that the plaintiff had suffered as a result of three years of racial harassment that comprised a hostile work environment. 774 F.3d at 146, 151-52, 162-63. As a result of the racial harassment campaign experienced by the plaintiff in Turley, the plaintiff had "lost 30 pounds; he suffered from panic attacks, depression, isolation and anxiety; [and] on two separate occasions, unable to withstand the hatred any longer, he was taken to the hospital directly from work." Turley v. ISG Lackawanna, Inc., 960 F. Supp. 2d 425, 449 (W.D.N.Y. 2013), aff'd in part, vacated in part, 774 F.3d 140 (2d Cir. 2014). At trial, Dr. Syed Jaffri, a psychiatrist, confirmed that Turley suffered from Post–Traumatic Stress Disorder and Adjustment Disorder and opined that Turley would continue to have triggers the rest of his life. Id. At one visit in 2008, Dr. Jaffri remembered that Turley presented as "noticeably distraught, depressed, hopeless, [and] helpless." Id. The district court in Turley

---

[2]    In Turley, the Second Circuit affirmed Plaintiff's compensatory damages award of $1,060,000 for a hostile work environment and its attendant emotional damages. See 774 F.3d at 163–64. According to the Bureau of Labor Statistics website, that sum has the same buying power as $1,481,809.59 in April 2025 dollars. See U.S. BUREAU OF LAB. STAT., CPI Inflation Calculator (last accessed June 2, 2025.) https://www.bls.gov/data/inflation_calculator.htm. See also Jennings v. Yurkiw, 18 F.4th 383, 393 n.7. (2d Cir. 2021) (using the Bureau of Labor Statistics CPI Inflation Calculator to assess prior damages awards to account for inflation.)

noted that while Turley "had possessed a colorful and animated personality," the harassment left him "broken and dispirited." Id. at 151.

Here, the Court recognizes that the jury similarly credited Plaintiff's testimony regarding her extensive emotional distress and does not seek to disturb their findings. Rather, the Court puts the emotional distress damages in context. Like Turley, Plaintiff here experienced a host of emotional distress and suffering after a long period of harassment that created a hostile work environment. (See Tr. 859-60, 865-67, 1020.) Additionally, like the Plaintiff in Turley, Plaintiff presented testimony from her physician substantiating her condition. See Sooroojballie, 816 Fed. App'x at 546 (holding that egregious emotional distress claims "generally contain evidence of debilitating and permanent alterations in lifestyle" corroborated by mental health professionals.) (quoting Menghi v. Hart, 745 F. Supp. 2d 89, 107 (E.D.N.Y. 2010)). Finally, unlike Turley, Plaintiff did not experience multiple outright threats against her life and did not experience two hospitalizations during the course of the alleged hostile work environment. Overall, these factors weigh in favor of a smaller award than Turley. Based on the foregoing, the Court finds that the "maximum amount" Plaintiff can be awarded without being excessive is $1,000,000.

In Turley, the Second Circuit favorably cited other seven-figure damages awards in multi-year harassment cases. 774 F.3d at 163 (citing Zeno v. Pine Plains Cent. Sch. Dist., 702 F.3d 655, 673 (2d Cir. 2012) and Pollard v. E.I. DuPont De Nemours, Inc., 412 F.3d 657 (6th Cir. 2005), aff'g 338 F. Supp. 2d 865 (W.D. Tenn. 2003)). While not directly analogous to this case, these cases have some similar features and help to set an upper range for cases involving serious emotional distress as a result of long-term harassing conduct. In Pollard, the plaintiff sought relief for a claim of intentional infliction of emotional distress under a Tennessee statute after experiencing long-term sexual harassment at her job. 412 F.3d at 664–65. The plaintiff, formerly "an outgoing, confident, self-assured, and professionally successful individual," "to a large degree

18

lost each of these attributes" because of the harassment and management's failure to remedy it. 338 F. Supp. 2d at 884.  The Sixth Circuit in <u>Pollard</u> affirmed a judgment granting, among other things, $950,000 in compensatory damages for emotional distress.  412 F.3d at 660-63, 666. Taking inflation into account, this award amounts to approximately $1.56 million compensatory damages award in 2025 dollars, exceeding the award in <u>Turley</u> and in this case.[3]  Furthermore, in <u>Zeno</u>, the Second Circuit upheld an award of compensatory damages in the amount of $1,000,000 for the plaintiff, a teenager who suffered educational harm and endured 3.5 years of racial harassment.  702 F.3d at 672–73.  In upholding this award, the Second Circuit held that "[t]he jury reasonably could have found that the harassment would have a profound and long-term impact on [plaintiff's] life and his ability to earn a living." <u>Id.</u> at 672.  Additionally, "[e]vidence presented at trial, including the testimony of [plaintiff], his mother, and Maxey (of the N.A.A.C.P.), revealed [plaintiff's] increasing frustration, loneliness, and other emotional anguish." <u>Id.</u>  Taking inflation into account, the award for compensatory damages in <u>Zeno</u> amounts to approximately $1.4 million in 2025 dollars.[4]

At the other end of the spectrum, Defendants cite to cases awarding low-to-mid six figures awards of compensatory damages for emotional distress in sexual harassment and discrimination cases.  (<u>See</u> Def. Br. at 11 (citing <u>Angulo v. 36th St. Hosp. LLC</u>, No. 19 CV-5075, 2020 WL 4938188, at *2 (S.D.N.Y. July 31, 2020), <u>report and recommendation adopted</u>, 2020 WL 4936961 (S.D.N.Y. Aug. 24, 2020); <u>Garcia v. Comprehensive Ctr., LLC</u>, No. 17-CV-8970, 2019 WL 8274296, at *1 (S.D.N.Y. Nov. 21, 2019), <u>report and recommendation adopted</u>, 2020 WL 1435002

---

[3] According to the Bureau of Labor Statistics' Inflation Calculator, $950,000 in June 2005 has the buying power of approximately $1.56 million in 2025.  CPI Inflation Calculator, United States Department of Labor, http://www.bls.gov/data/inflation_calculator.htm (last visited June 2, 2025).

[4] According to the Bureau of Labor Statistics' Inflation Calculator, $1,000,000 in December 2012 has the buying power of approximately $1.4 million in 2025.  CPI Inflation Calculator, United States Department of Labor, http://www.bls.gov/data/inflation_calculator.htm (last visited June 2, 2025).

(S.D.N.Y. Mar. 24, 2020); <u>Antoine v. Brooklyn Maids 26, Inc.</u>, 489 F. Supp. 3d 68, 99 (E.D.N.Y. 2020); and <u>Styka v. My Merchants Servs. LLC</u>, No. 14-CV-6198, 2016 WL 11396819, at *1 (E.D.N.Y. Mar. 15, 2016), <u>report and recommendation adopted</u>, 2016 WL 3866550 (E.D.N.Y. July 13, 2016)).

The recovery of non-economic compensatory damages in these cases cited by Defendants ranged from $120,000 to $300,000 (or from $161,000 to $371,000 in 2025 dollars). Again, none of these cases are directly analogous to the instant case, and they all have key differences distinguishing them from this case. <u>See</u> <u>Angulo</u>, 2020 WL 4938188, at *14 (recommending $300,000 in emotional distress damages in a sexual harassment case with a one-time sexual assault based on the complaint and plaintiff's affidavits on a default judgment motion); <u>Garcia</u>, 2019 WL 8274296, at *8 (recommending $120,000 in emotional distress damages in a sexual harassment case where plaintiff submitted affidavit stating she suffered physical violence and harassment for over a year on a default judgment motion); <u>Antoine</u>, 489 F. Supp. at 99-100 (recommending $200,000 in emotional distress damages in sexual harassment case involving a sexual assault and physical violence, but where the court noted a "near-complete absence of corroborating evidence" for plaintiff's testimony on a default judgment motion); <u>Styka</u>, 2016 WL 11396819, at *5 (recommending $120,000 in emotional distress damages in a sexual harassment case where allegations were supported by plaintiff's testimony only on a default judgment motion). Nevertheless, reference to the emotional distress awards in these cases is helpful to set a range of emotional distress awards in sexual harassment cases. Having carefully considered the evidence presented at trial in this case, as well as the damages awarded by other courts in comparable circumstances, the Court finds that finds that the "maximum amount" Plaintiff can be awarded without being excessive is $1,000,000.

Defendants also raise arguments suggesting that Plaintiff's pain and suffering were caused by her termination as opposed to the hostile work environment she experienced at Tuttnauer. (Def. Br. at 15-16, 17-18.) However, the jury was entitled to find that Plaintiff's pain and suffering commenced while she still worked for Tuttnauer and the hostile work environment was ongoing, as testimony was presented that her serious emotional and physical symptoms began in 2016-17. (Tr. 858-60, 1277, 1573-78.) Additionally, Defendants raise arguments implying that since Dr. Enoch Chan practices internal medicine and is not a psychiatrist, his diagnosis and treatment do not offer sufficient support for Plaintiff's emotional distress findings. (Def. Br. at 16.) However, the jury was entitled to find that Dr. Chan, a licensed physician specializing in internal medicine, appropriately diagnosed Plaintiff and prescribed this medication. Furthermore, Dr. Chan's findings of emotional distress were corroborated by Plaintiff's expert witness, her husband, and her son, who all testified regarding her substantial pain and suffering.

Defendants' other factual arguments against a finding of emotional distress damages do not warrant any further remittitur than the Court has already granted. First, Defendants argue that because Plaintiff forwarded two of the inappropriate workplace e-mails in 2011, she "knowingly participated" in the inappropriate workplace conduct at Tuttnauer. (See Def. Br. at 16 (citing Tr. Ex. X; UU).) However, this was from an earlier time period that preceded the bulk of the hostile work environment experienced by Plaintiff, and the jury was entitled to give that evidence the weight it deserved. Defendants also argue that there is no evidence of Plaintiff suffering permanently because Plaintiff's Social Security Administration disability finding did not explicitly find Plaintiff to be disabled as a result of PTSD and other mental conditions. (Def. Br. at 17.) While Defendants recognize that "it remains unclear as to the underlying basis for the [SSA's] decision to ultimately find Plaintiff disabled," they argue that "it is clear that such findings are not as a result of Plaintiff's alleged PTSD, depression, or other claimed emotional distress attributable

21

to Defendants." (Def. Mem. at 17).  However, the jury was still entitled to credit the large amount of testimony and evidence that documented Plaintiff's emotional distress, and the SSA disability determination does not warrant any further remittitur on Plaintiff's compensatory damages.

Finally, Defendants argue that remittitur is warranted because the jury's award of compensatory damages was improperly influenced by Plaintiff's counsel's summation. (Def. Br. at 19-20.)  However, there is no blanket prohibition against counsel asking the jury to award a specific damages amount.  "[T]he determination of whether to allow a plaintiff to request a specific damages amount from the jury is within the court's discretion. Although the Second Circuit has not prohibited parties from suggesting particular damages amounts to the jury, it has cautioned against this practice."  Bovell v. City of Mount Vernon, New York, No. 21-CV-1621, 2023 WL 3559544, at *9 (S.D.N.Y. May 18, 2023) (citation omitted); see Lightfoot v. Union Carbide Corp., 110 F.3d 898, 912 (2d Cir. 1997) ("It is best left to the discretion of the trial judge, who may either prohibit counsel from mentioning specific figures or impose reasonable limitations, including cautionary jury instructions").  The Court instructed the jury that summations are not evidence. (Tr. 1721 ). See Thomas v. Kelly, 903 F. Supp. 2d 237, 265 (S.D.N.Y. 2012) ("To cure any potential prejudice [from counsel's requested dollar amount), the Court reminded the jury that '[w]hat the lawyers have said the evidence shows in their opening statements, objections or questions, or have said in their closing arguments, is not evidence'").  Like Thomas, this Court charged that summations are "not evidence; it's just what the lawyers believe the evidence has shown." (Tr. 1721).  Jurors are presumed to follow these instructions. See U.S. v. Agrawal, 726 F.3d 235, 258 (2d Cir. 2013).

2.  Punitive Damages

With respect to punitive damages, Defendants contend that the punitive damages award should be reduced or eliminated because the $5 million punitive damages award exceeds the

statutory limit under Title VII.[5]  (Id. at 20-22.)  Defendants argue that the statutory cap for compensatory damages and punitive damages under Title VII is $50,000 because Tuttnauer USA employed between 14 and 101 employees during the relevant timeframe.  (Id.)  Plaintiff argues that a statutory cap of $300,000 applies to the Title VII damages because Tuttnauer USA operated as the "daughter company" and "sales arm" of Tuttnauer Ltd., which employed over 500 employees.  (Pl. Br. at 28-30.)  Furthermore, Plaintiff moves to allocate all of the compensatory damages for pain and suffering (less one dollar) to the uncapped NYSHRL claim and to allocate all of the punitive damages to the capped Title VII claim.  (ECF No. 117-5.)  For the following reasons, the Court grants Plaintiff's motion to allocate damages.  Furthermore, the Court grants Defendants' motion to reduce the punitive damages award in order to comply with Title VII's statutory cap.

District courts in the Second Circuit routinely allocate damages in cases alleging Title VII and state law discrimination claims such that "the successful plaintiff be paid under the theory of liability that provides the most complete recovery."  Singleton v. City of New York, 496 F. Supp. 2d 390,393 (S.D.N.Y. 2007) (citing Magee v. United States Lines, Inc., 976 F.2d 821, 822 (2d Cir. 1992)), aff'd, 308 Fed. Appx. 521 (2d Cir. 2009); see Mayo-Coleman v. Am. Sugar Holdings, Inc., No. 14-CV-79, 2018 WL 2684100, *2 (S.D.N.Y. Jun. 5, 2018) ("courts regularly allocate all, or nearly all, of the compensatory damages to the state law claims and the punitive damages to the Title VII claims in order to maximize plaintiffs' recovery by removing the compensatory damages from Title VII's statutory cap").  In light of the above, the Court grants Plaintiff's request to allocate all of the compensatory damages for pain and suffering (less one dollar) to the uncapped New York

---

[5] While Defendants only raise arguments about the statutory cap and do not argue that the jury lacked a factual basis to award punitive damages, the Court holds that there was a sufficient factual basis for an award of punitive damages and that an award of $299,999 in punitive damages is not unconstitutionally excessive under the relevant factors.  See State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 418 (2003).

State Human Rights Law claim and to allocate all of the punitive damages to the capped Title VII claim.

Turning to Defendants' argument to reduce the punitive damages award based on Title VII's statutory cap, the Court will reduce the jury's award of punitive damages to $299,999 to comply with the statutory cap. Under 42 U.S.C. § 1981a, the compensatory damages and punitive damage cap under Title VII is $50,000 for companies with between 14 and 101 employees and $300,000.00 for companies with more than 500 employees. Defendants argue that the $50,000 cap should apply because Tuttnauer USA employed between 14 and 101 employees during the relevant timeframe, while Plaintiff argues that the $300,000 cap should apply because Tuttnauer Ltd., Tuttnauer USA's parent company, employed over 800 employees. (See Def. Br. at 21; Pl. Br. at 28-30.) The Court agrees with Plaintiff and will apply the $300,000 statutory cap.

In Morelli v. Cedel, 141 F.3d 39 (2d Cir. 1998), the Second Circuit held that domestic employees may sue their foreign-based employer for violations of the ADEA. Id. at 41-44. Further, when counting employees for the purpose of determining whether jurisdiction over the employer exists under the ADEA (which limits its reach to employers with 20 or more employees), all employees of the foreign corporation were counted, not just U.S.-based employees. Id. at 44-45. In reaching this conclusion, the Second Circuit explicitly noted that the ADEA was modeled in large part on Title VII, which has minimum-employee requirements for reasons including the burdens of compliance and potential litigation costs, "the protection of intimate and personal relations existing in small businesses, potential effects on competition and the economy, and the constitutionality of Title VII under the Commerce Clause." Id. (citing Tomka v. Seiler Corp., 66 F.3d 1295, 1314 (2d Cir. 1995)). The court held that none of these reasons suggest that whether a foreign employer is subject to the ADEA should turn on the size of its U.S. operations alone. Id. This logic extends to the determination of the relevant statutory cap in this case, as the evidence at

24

trial revealed that Tuttnauer USA was the "sales arm" of Tuttnauer Ltd., which employed 800 employees worldwide.  (Tr. 912-13, 965, 1098.); see Greenbaum v. Handelsbanken, 26 F. Supp. 2d 649, 651-52 (S.D.N.Y. 1998) (relying on Morelli in recognizing that one counts all employees of a company in determining the statutory cap, *i.e.,* the employees of the bank where the plaintiff worked and its foreign parent).  In Greenberg, the court relied on Morelli to find that the proper entity for purposes of determining the statutory cap under § 1981 was the parent bank of the bank branch initially named in the lawsuit.  Id. at 655.  Furthermore, following the Second Circuit's ruling in Morelli, the court counted the entire worldwide employment of the parent bank in determining which statutory cap to apply.  Id.

Additionally, while the Court in Greenbaum did not apply the "single employer" doctrine for determining the proper entity to examine when applying the statutory cap under Title VII, courts in other circuits have utilized this doctrine for determining the relevant statutory cap in awarding damages.  See, e.g., Vance v. Union Planters Corp., 209 F.3d 438, 447 (5th Cir. 2000), Shipley v. Hypercom Corp., 09-CV-0265, 2012 WL 12872905 (N.D. Ga. Apr. 10, 2012); Story v. Vae Nortrak, 214 F. Supp. 2d 1209 (N.D. Ala. 2001).  Under this theory, if the entities are part of an integrated enterprise, then each entity is the same for purposes of calculating the number of employees at issue under the Title VII cap.

"The 'single or joint employer' test utilizes a four-factored analysis developed by the NLRB to determine whether two or more employers can be treated as one for purposes of assigning liability. In this Circuit, this analysis has been confined to two corporate contexts: first, where the plaintiff is an employee of a wholly-owned corporate subsidiary; and second, where the plaintiff's employment is subcontracted by one employer to another, formally distinct, entity."  Gulino v. New York State Educ. Dep't, 460 F.3d 361, 378 (2d Cir. 2006) (citing Cook v. Arrowsmith Shelburne, Inc., 69 F.3d 1235, 1240 (2d Cir. 1995) (identifying the four factors as "(1) interrelation

of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control")).  The inquiry is particularly focused on the second factor, "centralized control of labor relations."  Cook, 69 F.3d at 1241.  Additionally, "since '[t]he statutory cap is properly excluded from jury instruction, and only after a verdict is submitted, [must] the trial court [ ] ensure that any award complies with the relevant statutory maximums applicable,' the evidence the Court may consider when evaluating the size of a defendant employer is not restricted to the evidence actually offered at trial."  Shipley, 2012 WL 12872905, at *8 (N.D. Ga. Apr. 10, 2012) (citing Parrish v. Sollecito, 280 F. Supp. 2d 145, 155 (S.D.N.Y. 2003)).

As demonstrated at trial, Tuttnauer USA operated under the authority of President Ran Tuttnauer, who testified that Tuttnauer USA was the "daughter company" of Tuttnauer Ltd., or the "sales arm" of the parent company. (Tr. 1098; Pl.'s Ex. 21.)  Ran Tuttnauer was the President of Tuttnauer USA and the CEO of Tuttnauer Ltd.  (Tr. 1098.)  He testified that he came to the United States in 1987 and started Tuttnauer USA as the "sales arm" of Tuttnauer Ltd.  (Id.)  Tuttnauer Ltd. had several subsidiaries worldwide, including in Europe, China, and Vietnam.  (Tr. 1099.)  While supervisors and managers handled the day-to-day responsibilities of Tuttnauer USA, everyone answered to Ran Tuttnauer, as reflected in the organizational chart. (Tr. 1099-1103; Pl.'s Ex. 108.)

When Ran Tuttnauer sold the company in 2017, Nir Kinory became CEO of Tuttnauer Ltd. (Tr. 912-13.)  Mr. Kinory testified that Tuttnauer Ltd. had 800 employees worldwide and that Tuttnauer USA had 40 employees. (Tr. 965.)  Mr. Kinory testified that the management team of Tuttnauer Ltd. worked alongside Tuttnauer USA executives in 2017 to develop a business plan that would enable them to grow the overall company.  (Tr. 915-17.)  Mr. Kinory also testified that Tuttnauer Ltd. was responsible for the decision to terminate Plaintiff's employment and that he and Michael Sammet, CFO of Tuttnauer Ltd., were involved in that decision. (Tr. 921-22.)  Mr. Kinory testified that only headquarters, *i.e.,* Tuttnauer Ltd., had the authority to take employment

action against employees with Plaintiff's rank or higher.  (Tr. 923-24 ("Any executive who wanted to replace, substitute had to get the permission from the headquarter"); Tr. 924 ("Kevin could dismiss other  accountants by himself, but was not allowed to dismiss Ms. Russo without getting permission from the headquarter").)  Defendant Basile, Senior Vice President, also testified that when Ran Tuttnauer was CEO of Tuttnauer Ltd., Mr. Tuttnauer alone had authority to terminate anyone, including Plaintiff.  (Tr. 159).  Defendant Connors testified that termination decisions are "made along with the lawyers and the people in Israel."  (Tr. 347-48).

Given the evidence on the record, it is clear that Tuttnauer USA operated as a "sales arm" to parent company Tuttnauer Ltd., and the Court will use Tuttnauer Ltd.'s global employee count to set the Title VII statutory cap at $300,000.

# IV.    CONCLUSION

For the reasons set forth above, the Court DENIES Defendants' motion for a judgment as a matter of law.  The Court GRANTS Defendants' motion for remittitur as to compensatory damages and GRANTS Plaintiff's motion to allocate damages.  Because the Court finds the compensatory damages award excessive, the Court grants a new trial on the issue of compensatory damages only, unless plaintiff accepts a remittitur of the compensatory damages awarded from $2,500,000 to $1,000,000.  The Court also reduces the jury's punitive damages award based on Title VII's statutory cap of $300,000.  In sum, the Court allocates $999,999 in compensatory damages to the NYSHRL claim, $1 in compensatory damages to the Title VII claim, and $299,999 in punitive damages under Title VII, for a total award of approximately $1.3 million.

By August 8, 2025, Plaintiff's counsel shall file via ECF written notice of whether Plaintiff will accept the remitted compensatory damages award.  If Plaintiff elects to have a new trial on damages, the Court will schedule a conference to set a new trial date.  The Clerk of the Court is respectfully directed to terminate ECF Nos. 110 and 117.

**SO ORDERED.**

Dated:    June 6, 2025
          Central Islip, New York


                                    /s/ (JMA)
                             _____
                             JOAN M. AZRACK
                             UNITED STATES DISTRICT JUDGE