UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X

BARBARA RUSso,

                              Plaintiff,

-against-

TUTTNAUER USA COMPANY LIMITED,
BOB BASILE and KEVIN CONNORS,

                              Defendants.
------------------------------------------------------------------------X

For Online Publication Only

**MEMORANDUM & ORDER**
21-cv-1720 (JMA)(AYS)

FILED
CLERK

9:57 am, Aug 12, 2025

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**AZRACK, United States District Judge:**

Presently before the Court is Defendants' motion pursuant to Federal Rule of Civil Procedure 60 for reconsideration of this Court's June 6, 2025 ruling that sustained the punitive damages verdict and applied the $300,000 cap under Title VII.[1] (ECF No. 124.) According to Defendants, it was a misapplication of legal precedent to count the number of individuals employed globally by Tuttnauer, Ltd. when determining the relevant statutory cap for punitive damages under Title VII. (Id. at 1.) Plaintiff responds that Defendants have not met their burden to demonstrate that the Court's ruling was "clear error" or a "manifest injustice." (ECF No. 125 at 1.) For the following reasons, Defendants' motion for reconsideration is DENIED.

## I.    DISCUSSION

### A.  Motion for Reconsideration – Rule 60

"[A] motion for reconsideration 'is appropriate when the moving party can demonstrate that the Court overlooked controlling decisions or factual matters that were put before it on the underlying motion . . . and which, had they been considered, might have reasonably altered the result before the court.' Notably, 'a party may not advance new facts, issues, or arguments not previously presented to the Court on a motion for reconsideration.' Put simply, a reconsideration

---

[1] The Court assumes familiarity with the factual background and procedural history of this case and reviews it only as relevant to the present motion.

motion is not appropriate to simply secure a 'do-over.'" Superb Motors Inc. v. Deo, No. 23-CV-6188, 2025 WL 1456754, at *2 (E.D.N.Y. May 21, 2025) (citing Analytical Surveys, Inc. v. Tonga Partners, L.P., 684 F.3d 36, 52 (2d Cir. 2012) (a motion for reconsideration is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a second bite at the apple)).

The standard for a motion for reconsideration is "strict." Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995). "Reconsideration is warranted only when: (i) the moving party points to an intervening change in controlling law, (ii) newly available evidence is identified, (iii) clear error is established, or (iv) reconsideration is necessary to avoid a manifest injustice." Superb Motors Inc., 2025 WL 1456754, at *2.

**B. The Court's Ruling Does Not Constitute Clear Error or Manifest Injustice**

Despite Defendants' arguments to the contrary, the Court did not misapply Title VII's statutory cap in applying the $300,000 punitive damages cap, and this decision was neither "clear error" nor a "manifest injustice." Defendants argue that the Morelli and Greenbaum cases cited by the Court are inapplicable to this case because Tuttnauer Ltd. and Tuttnauer USA are separate legal entities, Plaintiff was not directly employed by Tuttnauer Ltd., and Plaintiff did not name Tuttnauer Ltd. as a defendant. (ECF No. 124 at 3-4.) Defendants further argue that the foreign employees of Tuttnauer Ltd. may not be considered when evaluating the headcount for Title VII purposes. (Id. at 3.) Plaintiff argues in response that the logic of Morelli and Greenbaum does apply to the instant case and that the application of the single-employer theory was appropriate in determining the applicable statutory cap under Title VII. (ECF No. 125 at 6-8.) For the following reasons, Defendant's motion for reconsideration fails.

In Morelli v. Cedel, 141 F.3d 39 (2d Cir. 1998), the Second Circuit held that domestic employees may sue their foreign-based employer for violations of the ADEA. Id. at 41-44.

2

Further, when counting employees for the purpose of determining whether jurisdiction over the employer exists under the ADEA (which limits its reach to employers with 20 or more employees), all employees of the foreign corporation were counted, not just U.S.-based employees. Id. at 44-45. In reaching this conclusion, the Second Circuit explicitly noted that the ADEA was modeled in large part on Title VII, which has minimum-employee requirements for reasons including the burdens of compliance and potential litigation costs, "the protection of intimate and personal relations existing in small businesses, potential effects on competition and the economy, and the constitutionality of Title VII under the Commerce Clause." Id. (citing Tomka v. Seiler Corp., 66 F.3d 1295, 1314 (2d Cir. 1995)). The court held that none of these reasons suggest that whether a foreign employer is subject to the ADEA should turn on the size of its U.S. operations alone. Id. This logic extends to the determination of the relevant statutory cap in this case, as the evidence at trial revealed that Tuttnauer USA was the "sales arm" of Tuttnauer Ltd., which employed 800 employees worldwide. (Tr. 912-13, 965, 1098.) While Defendant notes that the plaintiff in Morelli was directly employed by the foreign employer and had sued her foreign employer directly, Morelli's logic still supports the proposition that the Court may consider the global employment force of a parent company in determining which statutory cap to apply.

Shortly after the Court of Appeals issued Morelli, then-judge Sotomayor issued Greenbaum v. Handelsbaken, 26 F. Supp. 2d 649 (S.D.N.Y. 1998), holding that, in applying the punitive damages cap under Title VII, courts may consider the global workforce of the parent company, not just the domestic branch. Id. at 651. Moreover, Greenbaum held that while the plaintiff only sued the American branch, the parent bank "definitely could have been named as a defendant in this case, for the alleged discrimination occurred at SHG's New York operational branch." Id. at 652. Testimony in Greenbaum demonstrated that the parent bank and its American affiliate were not separate legal entities. Id. Moreover, Judge Sotomayor held, "the law seems

fairly well-settled that the domestic branch of a foreign bank is not a separate legal entity under either New York or federal law." (Id.) While this case does not involve domestic and international banking institutions, the reasoning in Greenbaum applies to the application of the Title VII statutory cap in this case.

Additionally, while the Court in Greenbaum did not apply the "single employer" doctrine for determining the proper entity to examine when applying the statutory cap under Title VII, courts in other circuits have utilized this doctrine for determining the relevant statutory cap in awarding damages. See, e.g., Vance v. Union Planters Corp., 209 F.3d 438, 447 (5th Cir. 2000), Shipley v. Hypercom Corp., 09-CV-0265, 2012 WL 12872905 (N.D. Ga. Apr. 10, 2012); Story v. Vae Nortrak, 214 F. Supp. 2d 1209 (N.D. Ala. 2001). Under this theory, if the entities are part of an integrated enterprise, then each entity is the same for purposes of calculating the number of employees at issue under the Title VII cap. As analyzed in the Court's June 6, 2025 decision (ECF No. 123 at 25-27), Plaintiff satisfied the single employer theory test, demonstrating that Tuttnauer USA and Tuttnauer Ltd. are sufficiently integrated for purposes of applying the punitive damages cap. (Id.) Despite Defendants' arguments to the contrary, the single employer doctrine may be applied to determine the relevant statutory cap in these circumstances, and foreign employees may be counted in determining that statutory cap. See Wildridge v. IER, Inc., 65 F. Supp. 2d 429, 431 (N.D. Tex. 1999) ("The exemption for overseas operations of foreign companies speaks only to the substantive protections of Title VII. It does not preclude counting employees of these foreign entities for purposes of determining whether the minimum-employee threshold is met. The reasons for requiring a minimum number of employees are not implicated when foreign and domestic companies, acting as an integrated enterprise, have more than 15 employees combined."); see also Kang v. U Lim Am., Inc., 296 F.3d 810, 816 (9th Cir. 2002) ("The fact that some of the employees of the integrated enterprise are not themselves covered by federal anti-discrimination law [because

4

they are non-U.S. citizens employed abroad] does not preclude counting them as employees for the purposes of determining Title VII coverage") (citing Morelli, 141 F.3d at 44-45); Arroyo-Perez v. Demir Group Int'l, 762 F. Supp. 2d 374, 388 (D. P.R. 2011) (counting the Canadian employees of one entity along with the Florida-based employees of a related entity to determine the employee headcount).

As demonstrated at trial, Tuttnauer USA operated under the authority of President Ran Tuttnauer, who testified that Tuttnauer USA was the "daughter company" of Tuttnauer Ltd., or the "sales arm" of the parent company. (Tr. 1098; Pl.'s Ex. 21.) Ran Tuttnauer was the President of Tuttnauer USA and the CEO of Tuttnauer Ltd. (Tr. 1098.) He testified that he came to the United States in 1987 and started Tuttnauer USA as the "sales arm" of Tuttnauer Ltd. (Id.) Tuttnauer Ltd. had several subsidiaries worldwide, including in Europe, China, and Vietnam. (Tr. 1099.) While supervisors and managers handled the day-to-day responsibilities of Tuttnauer USA, everyone answered to Ran Tuttnauer, as reflected in the organizational chart. (Tr. 1099-1103; Pl.'s Ex. 108.)

When Ran Tuttnauer sold the company in 2017, Nir Kinory became CEO of Tuttnauer Ltd. (Tr. 912-13.) Mr. Kinory testified that Tuttnauer Ltd. had 800 employees worldwide and that Tuttnauer USA had 40 employees. (Tr. 965). Mr. Kinory testified that the management team of Tuttnauer Ltd. worked alongside Tuttnauer USA executives in 2017 to develop a business plan that would enable them to grow the overall company. (Tr. 915-17.) Mr. Kinory also testified that Tuttnauer Ltd. was responsible for the decision to terminate Plaintiff's employment and that he and Michael Sammet, CFO of Tuttnauer Ltd., were involved in that decision. (Tr. 921-22.) Mr. Kinory testified that only headquarters, *i.e.,* Tuttnauer Ltd., had the authority to take employment action against employees with Plaintiff's rank or higher. (Tr. 923-24 ("Any executive who wanted to replace, substitute had to get the permission from the headquarter"); Tr. 924 ("Kevin could dismiss other accountants by himself, but was not allowed to dismiss Ms. Russo without getting

5

permission from the headquarter").) Defendant Basile, Senior Vice President, also testified that when Ran Tuttnauer was CEO of Tuttnauer Ltd., Mr. Tuttnauer alone had authority to terminate anyone, including Plaintiff. (Tr. 159). Defendant Connors testified that termination decisions are "made along with the lawyers and the people in Israel." (Tr. 347-48).

Given the evidence on the record, it is clear that Tuttnauer USA operated as a "sales arm" to parent company Tuttnauer Ltd., and the Court will use Tuttnauer Ltd.'s global employee count to set the Title VII statutory cap at $300,000.

## II. CONCLUSION

For the reasons set forth above, the Court DENIES Defendants' motion for reconsideration. Separately, the Court GRANTS Plaintiff's request to enter judgment in this case. (See ECF No. 127.) The Clerk of the Court is respectfully directed to terminate ECF No. 124.

**SO ORDERED.**

Dated:   August 12, 2025
         Central Islip, New York

                                                   /s/ (JMA)
                                           JOAN M. AZRACK
                                           UNITED STATES DISTRICT JUDGE